# IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

| | | |
|---|---|---|
| **RICH ANDERS, et al.,** | : | **CIVIL ACTION** |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | **NO. 04-0036** |
| | : | |
| **PUERTO RICAN CARS, INC., d/b/a** | : | |
| **HERTZ RENT-A-CAR, et al.,** | : | |
| **Defendants** | : | |

## M E M O R A N D U M

**STENGEL, J.**                                           **September 15, 2009**

Rich and Maria Anders, husband and wife, were seriously injured in a one-car accident while test driving a used 2001 Toyota Echo on May 12, 2003 on St. Thomas, United States Virgin Islands. The couple subsequently filed an action[1] in this court against: (1) Toyota Motor Corporation; (2) Toyota de Puerto Rico; (3) Puerto Rican Cars d/b/a Hertz Rent-A-Car; and (4) Hertz Corporation. Although it is difficult to decipher which claims are being brought against which defendant,[2] it seems that the plaintiffs are alleging the defective design and manufacture of the Echo's various systems, and its improper service, maintenance, and inspection. The defendants filed timely motions for summary judgment to which the plaintiffs responded. For the following reasons, I will

---

[1] The plaintiffs were represented by counsel when their fourth amended complaint was filed. See Document #218. On February 22, 2008, I granted counsel's motion to withdraw which was filed after the depositions of the plaintiffs. See Document #358. The plaintiffs have continued in the case *pro se*.

[2] This difficulty would have been assuaged by compliance with Federal Rule of Civil Procedure 10(b) which provides that each claim founded on a separate transaction or occurrence must be stated in a separate count if doing so would promote clarity.

grant the motions in their entirety, and enter judgment on behalf of the defendants and against the plaintiffs.

## I. BACKGROUND

The plaintiffs are originally from Austria and were living on St. Thomas at the time of the accident. <u>See</u> Rich Anders Dep. at 5; Maria Anders Dep. at 5. The complaint alleges that on May 12, 2003, the plaintiffs went to the compound of Defendant Puerto Rican Cars to look at several used vehicles available for purchase. <u>See</u> Fourth Amended Complaint ("Am. Compl.") ¶¶ 9, 13. Puerto Rican Cars operated the Hertz car rental facility on St. Thomas. <u>Id.</u> ¶¶ 5, 13, 14; Rich Anders Dep. at 8. The plaintiffs were allegedly drawn to these cars because of the national reputation of the Hertz Corporation for good and reliable cars. Am. Compl. ¶¶ 10, 14. After choosing a particular 2001 two-door Echo, the manager allowed the plaintiffs to take the car for a test drive, and instructed Everett Simmonds, one of his mechanics, to accompany them during the test. <u>Id.</u> ¶ 15.

The amended complaint further alleges that when Mr. Anders first drove the Echo, he noticed that the brakes pulled to the left. <u>Id.</u> ¶ 16. He pointed that out to Mr. Simmonds who represented that the brakes would be fixed if the plaintiffs decided to purchase the vehicle. <u>Id.</u> Notwithstanding his suspicion of potentially faulty brakes, Mr. Anders drove the Echo up a steep hill known as Blackpoint Hill, then turned around to drive back down the hill. <u>Id.</u> ¶ 17. As he approached a curve in the steep portion of the

hill, Mr. Anders attempted to apply the brakes but they would not engage. Id. ¶ 18. He then pumped the brakes several times to no avail. Id. The Echo accelerated sharply and "went out of control." Id. ¶¶ 18-19; Rich Anders Dep. at 26-27. Mr. Anders testified that he also tried stopping the car by stepping on a black pedal located at the far left of the floorboard, but that did nothing because it was only a rubber foot rest. Id.; see also Stapleton Dep. at 50-51. When Mr. Anders lost control of the Toyota Echo, it traveled from the normal left lane of travel, crossed the right lane, struck a guard rail, and veered back across the right lane into the left lane before coming to a complete stop.[3] See Rich Anders Dep. at 27. All occupants of the car were injured and required treatment. Id. at 130; Maria Anders Dep. at 34; Moses Dep. at 9.

The complaint also alleges that during the accident, the driver's side seat belt allegedly disengaged, and both of the front air bags[4] failed to employ. See Am. Compl. ¶ 20. Mr. Simmonds, who was riding in the back seat, allegedly failed to secure his seat belt, so that upon impact, he "flew forward" and hit the front passenger seat pushing it forward. Id. ¶ 21. Mrs. Anders had been riding in the front passenger seat during the test. See Rich Anders Dep. at 12-14.

The record contains a copy of the Uniform Traffic Accident Report which was

---

[3] Mr. Anders requested that I disregard his deposition testimony concerning all events occurring after his head struck the windshield. He concedes that that portion of his testimony is based upon hearsay, his own conjecture, and visions rather than on reality. See Document #377.

[4] This allegation is belied by the many photographs filed in this case which clearly show that both air bags had deployed upon impact. See, e.g., Documents #402-6, 402-7, and 402-8.

completed and signed by the investigating officer. Attached to the report is a statement

given by Mr. Simmonds who provided the following narrative of the accident:

> We drove up the hill good having a conversation about how
> good the car performed. When we got to the top of the hill,
> we turned around and proceeded back down hill. When I saw
> the car was going with too much speed, I then told him to
> slow down and while speaking to him, it seemed that he lost
> control of the car and instead of him slowing down. I don't
> know how his foot got caught between the brakes and the gas
> but next thing I know is that we slammed into the guard rail,
> causing the accident.

On the same form, the investigative officer wrote, "vehicle #1, while traveling

westward on Blackpoint Hill, collided with the guard rail, then the side of the road, when

it was going down hill and brakes failed, causing an accident."

The amended complaint also alleges that the Echo was "the subject of a recall by

Toyota for a brake problem similar to what occurred in this accident and either failed[5] to

perform the recall work on this vehicle or Hertz Defendants failed to have the recall work

performed." Id. ¶ 22. The plaintiffs allege that as "a direct and proximate result of the

product defects and the negligence of the Defendants, the Plaintiffs suffered physical

---

[5] As this paragraph of the complaint is written, it is impossible to decipher what other
entity besides Hertz the plaintiffs are alleging failed to perform the recall work. Whichever
entity is alleged to have failed to perform it, however, is not dispositive of this claim. The recall
to which the plaintiffs refer, known as the "Special Service Campaign," concerned vehicles
driven under repeated start and stop operation in extremely low ambient temperatures and in
deep snow where snow may accumulate in the rear wheel well and freeze, quite unlike the
weather in the U.S. Virgin Islands. See Ex. 6 to Document #417. It also applied only to certain
vehicles within a specified range of Vehicle Identification Numbers, which did not include the
Echo in this case. Id. Finally, there is no testimony by any witness to connect the subject matter
of a "deep snow recall" to this accident.

injuries, medical expenses, loss of capacity to earn income, economic loss, mental anguish, pain and suffering and loss of enjoyment of life, and loss of consortium of each other, all of which will continue into the foreseeable future." Id. ¶ 23.  Finally, the plaintiffs claim that they are entitled to an award of punitive damages because the "acts and omissions, and the design and manufacturing defects are so outrageous and done with such a reckless disregard for the rights and interests of the Plaintiffs." Id. ¶ 24.

## II.  STANDARD FOR SUMMARY JUDGMENT

Summary judgment shall be awarded "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c).  A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" only if it might affect the outcome of the suit under governing law. Id.

A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply

by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325. After the moving party has met its initial burden, "the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." FED.R.CIV.P. 56(e). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. All inferences must be drawn and all doubts resolved in favor of the nonmoving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); Gordon v. Youmans, 358 F.2d 261, 262 (2d Cir. 1965); Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985); Anderson, 477 U.S. at 255. The court must decide not whether the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. Anderson, 477 U.S. at 252. If the non-moving party has met the extraordinarily low burden of evidence and offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent. Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## III. DISCUSSION

In satisfying their initial Celotex burden, the defendants correctly point out that

there is an absence of evidence to support the plaintiffs' case.  <u>Celotex</u>, 477 U.S. at 325.

The complaint and other pleadings filed by the plaintiffs are filled with allegations, but

are unfortunately bereft of proof.  In an attempt to provide evidence to support their

allegations, the plaintiffs have offered Mr. Edwin Stapleton as an expert witness.  The

record contains a written report and the deposition transcript of Mr. Stapleton.  The

defendants challenge Mr. Stapleton's status as an expert witness, and argue that any

opinion offered by Mr. Stapleton, either as an expert witness or a lay witness, should not

be admitted as evidence.

One of the functions of a district court judge is to rule on preliminary questions of

admissibility, including the qualifications of a person to be a witness.  FED. R. EVID.

104(a).  The Supreme Court has generally required the district court to act as

"gatekeeper" to assure that the technique, procedure, and methodology upon which an

expert opinion is founded is reliable, i.e., that the expert's conclusion is based on good

grounds.  <u>See</u> <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579 (1993).  Expert

testimony is addressed by Rule 702 of the Federal Rules of Evidence, which provides

that:

> If scientific, technical, or other specialized knowledge will
> assist the trier of fact to understand the evidence or to
> determine a fact in issue, a witness qualified as an expert by
> knowledge, skill, experience, training, or education, may
> testify thereto in the form of an opinion or otherwise.

This rule has been interpreted as having three major requirements: (1) the witness

must be an expert; (2) the procedures and methods used must be reliable; and (3) the testimony must fit the factual dispute at issue so that it will assist the jury. Daubert, 509 U.S. at 591; United States v. Downing, 753 F.2d 1224, 1242 (3d Cir. 1985).

The first requirement of Rule 702, that a witness proffered to testify to specialized knowledge must be an expert, has been interpreted liberally by the courts. See In re Paoli R.R. Yard PCB Litig. (Paoli I), 916 F.2d 829, 855 (3d Cir. 1990). A broad range of knowledge, skills, and training may qualify an expert as such. Id. The Court of Appeals for the Third Circuit has eschewed imposing overly rigorous requirements of expertise and has been satisfied with more generalized qualifications. See Hammond v. International Harvester Co., 691 F.2d 646, 652-53 (3d Cir. 1982) (an engineer, whose only qualifications were sales experience in the field of automotive and agricultural equipment and teaching high school automobile repair, nevertheless could testify in a products liability action involving tractors); see also Knight v. Otis Elevator Co., 596 F.2d 84, 87-88 (3d Cir. 1979) (an expert could testify that unguarded elevator buttons constituted a design defect despite expert's lack of specific background in design and manufacture of elevators). While a witness may satisfy the minimum requirements to qualify as an expert, his level of expertise may nevertheless affect the reliability of the expert's opinion. In re Paoli R.R. Yard PCB Litig. (Paoli II), 35 F.3d 717, 741 (3d Cir. 1994).

The second requirement of Rule 702 is that the expert must testify to "scientific,

technical or other specialized knowledge [that] will assist the trier of fact." FED. R. EVID. 702. An expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable. Daubert, 509 U.S. at 592. A district court should consider several factors in evaluating whether a particular scientific methodology is reliable, including the testability of the expert's hypothesis, whether the methodology has been subjected to peer review and publication, the frequency by which the methodology leads to erroneous results, the existence and maintenance of standards controlling the technique's operation, and whether the methodology has been generally accepted in the scientific community. Daubert, 509 U.S. at 592-594; see also Downing, 753 F.2d at 1238-39 (in addition to the Daubert factors, a district court should also consider whether a method produces testable hypotheses; the existence of standards controlling the technique's operation; the degree to which the expert testifying is qualified; the relationship of a technique to more established modes of scientific analysis; and the non-judicial uses to which the scientific technique are put). A district court should take into account all of the these factors as well as any others that are relevant. Paoli II, 35 F.3d at 742. Under the Rules of Evidence, the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable. Downing, 753 F.2d at 1237.

In addition to reliability, Rule 702 requires that the expert's testimony must assist the trier of fact. Admissibility depends in part on the proffered connection between the

research or test result to be presented and particular disputed factual issues in the case. Downing, 753 F.2d at 1237. Expert testimony is only helpful to the trier of fact if it addresses factual issues implicated by the facts of the particular case. See Daubert, 509 U.S. at 591-595.

Accordingly, admissibility under Rule 702 is governed by Rule 104(a), which requires the judge to conduct preliminary fact finding to make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid," and thus enables the judge to exclude evidence presented in the plaintiffs' *prima facie* case. Daubert, 509 U.S. at 592-93. A party who wants to introduce expert testimony bears the burden of showing that a technique is reliable by more than a *prima facie* showing. Paoli II, 35 F.3d at 743; Downing, 753 F.2d at 1240 n. 21. A judge should find an expert opinion reliable under Rule 702 if it is based on "good grounds," i.e., if it is based on reliable and replicable methods and procedures. A judge may find that an expert has good grounds to hold his opinion even though the judge thinks that the opinion is incorrect. Paoli II, 35 F.3d at 744. The focus must be solely on principles and methodology, not on the conclusions that they generate. Daubert, 509 U.S. at 595. The primary limitation on the judge's admissibility determination is that the judge should not exclude evidence simply because he thinks that there is a flaw in the expert's investigative process that renders the expert's conclusions incorrect. The judge should only exclude the evidence if the flaw is large enough that the expert lacks "good grounds"

for his conclusions.  Paoli II, 35 F.3d at 746.

Here, Mr. Stapleton, the plaintiffs' proffered expert witness, is an automobile mechanic who operates a local business on St. Thomas named Stapleton Auto Repair. See Stapleton Dep. at 4.  He is a long-time acquaintance of the plaintiffs, has been their mechanic for many years, and has also been a customer of the plaintiffs' computer business.  Id. at 75, 76.  He has neither testified previously as an expert witness nor ever been qualified as an expert witness.  Id. at 4-5.  For many years before 1995, the year a hurricane destroyed his home, Mr. Stapleton performed other work in addition to operating his auto mechanic shop.  These jobs included milking cows and performing "veterinarian work" for St. Thomas Dairies, and selling insurance for PIC.  Id. at 110, 118.  Mr. Stapleton has no formal university degree although he has received certifications in auto mechanics through attending seminars.  He received his training through a home study course in 1978.  Id. at 5, 119-120.  Mr. Stapleton testified that he does not have any specialized training, knowledge, or opinions about air bags, car seat belts, or car seat systems.  Id. at 5-6, 62, 65, 68, 73.

While Mr. Stapleton may be knowledgeable about brake repair and maintenance, his background is woefully lacking in any expertise in accident reconstruction or investigation.  This became obvious as he recounted the manner in which he conducted the inspection of the Echo.  When Mr. Stapleton arrived at the storage facility to inspect the Echo, he needed to send his assistant back to get his tape measure to measure the

thickness of the brake pads and the rotors. He admitted that his calipers would have

given more accurate readings. See Stapleton Dep. at 9-10, 82. In fact, he testified that he

would never use a tape measure for his own business, but instead would use his device

known as a micrometer for the most accurate readings. Id. at 32. After much discussion

about the proper measurements of the brake pads and rotors, Mr. Stapleton admitted that

he really had no idea what the "federal standard" for the thickness of the brake pads and

rotors would be for the Echo. Id. at 37, 43. He assured counsel that the "federal

standard" would be found in the "Toyota Book" for that particular model of car, which he

did not possess. Id. at 34-36. Mr. Stapleton has older books in his possession but not

books for newer models of cars. Id. at 36. In determining whether a particular brake part

would need replacement, Mr. Stapleton said that he could just "eyeball it," rather than

measuring it. Id. at 44. He testified that a thin or low brake pad would not result in brake

failure. Id. at 39. Mr. Stapleton felt like the rotors on the Echo had never been changed

but the brake pads had been changed. Id. at 45-46. He was quite sure, however, that

someone "was messing" with the rotor before it went into storage. Id. at 45. Mr.

Stapleton also testified that he did not check the rear brakes, but there was no reason to

believe that anything was wrong with those in his opinion. Id. at 46. The rear brakes

have "shoes and drums" and typically outlast the front brakes by about two to three years.

Id. at 46. Mr. Stapleton also noticed that the master cylinder's reservoir had come off, but

had no idea how that happened. Id. at 52-53. He admitted that it could have happened

during the collision, but if the reservoir had been off before the test drive began, the car would have had no brakes from the beginning.  Id. at 54.  There was a straw-type tool placed inside the reservoir which made Mr. Stapleton believe that someone had been taking samples of the brake fluid.  Id. at 53.  He conceded that it was this tool emanating from the reservoir which made him write in his report:  "Therefore, evidence clearly shows someone had tampered with the vehicle's master cylinder and brake system component after the accident making it impossible to establish the condition of the vehicle's brake system as it was at the time of the accident."  Id. at 58, 59; see also Stapleton Report at 2.  When asked what caused the accident, Mr. Stapleton responded, "I think it was poor maintenance on the car.  The brakes failed . . . from what I observed."  See Stapleton Dep. at 78.

At other points during his deposition, Mr. Stapleton seemed to not understand the questions being posed.  For example, counsel asked a seemingly innocuous question regarding the maintenance of his micrometer, the device which Mr. Stapleton hailed as the one producing the most exact measurements:

> Q.    And how often is [the micrometer] supposed to be calibrated?
>
> A.    Well, it come [sic] with extra batteries.  So if one battery dies, you put a next one in.  It comes with extra batteries.

Id. at 80.  Later, counsel attempted to clarify Mr. Stapleton's educational background:

> Q.    So as you sit here today, do you have any degree from any correspondence courses?

A.   Well, I have a master's degree in automotive training.

Q.   You have a master's degree?

A.   Yes.

Q.   Do you have a bachelor's degree in mechanic training?

A.   Yes.

Q.   Where did you get the bachelor's degree?

A.   Well, not a bachelor's, no.  I didn't get a bachelor's.  I had a study.  I get [sic] the master's degree but I have all the diplomas on everything. . .

Q.   So when you got a master's, how long did you have to go to school?

A.   I studied that for four years.

Q.   For four years, okay.  And what was the name of the school that you got the master's?

A.   Same school I just mentioned.

Q.   The home study course?

A.   Yes.

Q.   The National Radio Institute?

A.   Right.

Q.   Did you get a degree underneath the master's like a bachelor's?

A.   Yes.  When I went for the master's I had get [sic] something like a bachelor's degree.

Q.   And how many years did you go for the bachelor's?

A.   Like maybe two years.  That's when I completed that.

> Q. So did you go to the States to do that, sir, or did you do that here?
>
> A. I was here and then I leave here and then I went to school and I work in Washington – not in Washington, Baltimore.
>
> Q. Doing what?
>
> A. Same mechanic work.
>
> Q. Was that National Radio Institute, is that accredited?
>
> A. I think so.

Id. at 116-118. After continued prodding, it was determined that Mr. Stapleton had studied and received a certificate as a master mechanic, as opposed to a master's degree from a university. Id. at 120. These exchanges, however, are examples of a common thread of confusion throughout Mr. Stapleton's deposition.

Another troublesome aspect of qualifying Mr. Stapleton to testify as an expert witness is the fact that over five years had passed between the accident and his inspection of the Echo. It would have been difficult for the most experienced accident reconstruction or investigation expert to theorize what caused that accident five years earlier. By the time Mr. Stapleton inspected the Echo, the brake pads and rotors were covered with extensive rust. Notwithstanding his opinion that evidence tampering made it impossible to establish the condition of the brake system at the time of the accident, Mr. Stapleton concluded that the accident was caused by the Echo's brake problems resulting from poor maintenance. See Stapleton Dep. at 54.

After a review of Mr. Stapleton's deposition testimony and his written report, I am

constrained to find that Mr. Stapleton lacks the qualifications necessary to be an expert witness. While his familiarity with brake repair may be apparent, he concedes that he lacks specialized knowledge, skills, and training in other automobile systems important here, i.e., air bags, car seat belts, and car seats. He further concedes that his measurements were taken with the least accurate device of the three measuring tools in his possession. He was also not familiar with the exact standards of thickness for the Echo's brakes and rotors, and did not research those standards in anticipation of the inspection, written report, or deposition. Because of this lack of specialized knowledge and lack of accurate testing methods used, I am not confident that the opinions of Mr. Stapleton are reliable or that they would be helpful to the jury in understanding the case. To the contrary, I find that Mr. Stapleton does not have "good grounds" for his belief that the accident was caused by brake failure due to poor maintenance. His opinions are unsupported, speculative, based on conjecture, and would tend to confuse the jury. Accordingly, I do not accept Mr. Stapleton as an expert witness.

Even if Mr. Stapleton were proffered as a lay witness, his testimony on behalf of the plaintiffs would still not be permissible. Rule 701 of the Federal Rules of Evidence states:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or

other specialized knowledge within the scope of Rule 702.

Through no fault of his own, Mr. Stapleton first inspected the Echo over five years after the accident. His opinions are based on that limited inspection of the Echo, on photographs taken by others, and on the statements of others. Accordingly, his opinions or inferences cannot be rationally based on his own perceptions, helpful to the determination of a fact at issue in this case, or helpful to the jury's understanding. See Asplundh Mfg. Div. v. Benton Harbor Engineering, 57 F. 3d 1190 (3d. Cir. 1995) (if a witness seeks to offer an opinion on a subject that calls for expertise he does not possess, the opinion is not one that would be either rational or helpful). Furthermore, because it would be necessary in this case that a proposed witness possess the technical or other specialized knowledge generally within the scope of Rule 702, Mr. Stapleton's lay opinions would not be permitted.

## A. Toyota Defendants[6]

I construe the amended complaint to allege that Toyota defectively designed and manufactured the 2001 Echo, specifically asserting that: (1) the brakes did not operate properly to stop the car on its downhill trip; (2) Mr. Anders' seat belt became disengaged upon impact; (3) both of the front air bags failed to deploy; and (4) the front passenger seat moved forward when the unrestrained Everett Simmons "flew forward" into it. The plaintiffs allege that their injuries and resulting damages were a direct and proximate

_____

[6] The plaintiffs allege that Toyota de Puerto Rico distributed the Echo, but make no other claims against that particular defendant.

result of these alleged product defects.

Section 402A of the Restatement (Second) of Torts is the controlling law on products liability in the U.S. Virgin Islands.  See Banks v. Int'l Rental & Leasing Corp., 2008 U.S. Dist. LEXIS 12214, 10-11 (D. V.I. Feb. 13, 2008).  Section 402A provides:

> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>
> (a)    the seller is engaged in the business of selling such a product, and
> (b)    it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
>
> (2) The rule stated in Subsection (1) applies although
>
> (a)    the seller has exercised all possible care in the preparation and sale of his product, and
> (b)    the user or consumer has not bought the product from or entered into any contractual relation with the seller.

RESTATEMENT (SECOND) OF TORTS § 402A.

Thus, in order to prevail in this case against Toyota, the plaintiffs must prove the existence of an unreasonably dangerous defect of the brake system, the car seat belt system, the air bag system, or the car seat system that was present at the time the 2001 two-door Echo left the possession and control of Toyota as the original seller of the Echo.

Usually, proving the existence of a defect in a product requires testimony from a qualified expert.  See Belofsky v. General Elec. Co., 1 F.Supp. 2d 504 (D. V.I. 1998).

"Where the issue concerns a product's design, … it would seem that expert opinion is the only available method to establish defectiveness, at least where the design is not patently defective." Jones v. Toyota Motors Sales, 94 Fed. Appx. 879, 881 (3d Cir. 2004) (citing Huddell v. Levin, 537 F.2d 726, 736 (3d Cir. 1976)). Proving that an alleged defect was the legal cause of an injury requires testimony from a qualified expert who can testify about specific causation, just as "expert testimony is required to establish the standard of care and causation in medical malpractice cases in the Virgin Islands." See Chivetron v. Johnston, 2004 U.S. Dist. LEXIS 20875, n.8 (D. V.I. 2004); see also Wade-Greaux v. Whitehall Laboratories, Inc., 874 F.Supp. 1441, 1475 (D. V.I. 1994). Expert testimony offered by a competent expert who has an analytical and factual basis for his opinions should be required of plaintiffs in an automotive products liability case. Koplove v. Ford Motor Co., 795 F.2d 15, 18 (3d Cir. 1986).

The plaintiffs have failed to identify any defect in the Echo, let alone an unreasonably dangerous one, that existed at the time it left Toyota. They offered no evidence to establish a defect in the brakes, the air bags, the driver-side seat belt, or the passenger-side seat. The plaintiffs have further failed to provide a causal connection between any alleged defect in the Echo and the physical injuries they suffered. Thus, any claim for strict liability under Section 402(A) of the Restatement (Second) of Torts cannot stand. It is well settled that there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.

<u>Anderson</u>, 477 U.S. at 248. Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial." <u>Matsushita Electric Indus. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). The plain language of Rule 56(c) mandates that the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. <u>Woelpper v. Scott Aviation</u>, 1991 U.S. Dist. LEXIS 12913 (E.D. Pa. 1991). Accordingly, there being no genuine issue for trial here, I will grant Defendant Toyota's motion for summary judgment.

### B. Puerto Rican Cars, Inc., d/b/a Hertz Rent-A-Car

I further construe the fourth amended complaint to allege that Puerto Rican Cars was negligent in that it: (1) failed to service, maintain, and inspect properly the Toyota Echo; (2) failed to perform the corrective work on the Echo's brakes that had been the subject of a recall by Toyota;[7] (3) is liable through the doctrine of *respondeat superior* for the failure of its employee, Mr. Simmonds, to secure his seat belt causing him to "fly forward" into the front passenger seat upon impact which caused injury to Mrs. Anders. Puerto Rican Cars insists that it breached no duty owed to the plaintiffs. It further argues

---

[7] As discussed above, the evidence shows that in 2001–2002, Toyota Echos were subject to a recall by Toyota due to brake problems associated with cold weather and deep snow. This situation is inapplicable to the climate of the U.S. Virgin Islands. The recall also applied only to vehicles within a specified range of Vehicle Identification Numbers, which did not include the Echo in this case. Accordingly, no defendant can be held negligent for failure to perform such unnecessary work.

that the plaintiffs have failed to prove that it is liable to the plaintiffs for alleged improper service, maintenance, inspection, or for any other negligence. I agree.

To state a claim for negligence in the Virgin Islands, a plaintiff must allege (1) a duty; (2) a breach of that duty; (3) causation; and (4) damages. Matos, et al. v. Nextran, Inc., et al., 2009 U.S. Dist. LEXIS 71041, *16 (D. V.I. August 10, 2009) (quoting Charleswell v. Chase Manhattan Bank, N.A., 308 F. Supp. 2d 545, 571 (D. V.I. 2004)); see also Restatement (Second) of Torts § 281 (stating the elements of negligence).[8] Here, Puerto Rican Cars, as the used car seller, owed a duty to potential buyers of its used automobiles, which included reasonable inspection, testing, warning of defects, and the use of reasonable care in the performance of any repairs or replacements it may have made to the vehicle.

Whether Puerto Rican Cars breached that duty remains unproven. The plaintiffs' theory of improper service, maintenance, and inspection is speculative and unsupported by any evidence. The plaintiffs' unsuccessful attempt to prove their case through the retention of an unqualified expert renders any such theory unreliable. This is especially true when viewed against the expert reports of Alan B. Weckerling, the defendants' expert. Mr. Weckerling is the president of Weckerling Scientific Laboratories, Inc. He is also a Fellow in the American Academy of Forensic Sciences, and is certified in crash data retrieval. The plaintiffs have not challenged Mr. Weckerling's qualifications as an

---

[8] See V.I. Code Ann. tit. 1, § 4 (the Restatements are the law of the Virgin Islands in the absence of local law to the contrary).

expert witness.

Mr. Weckerling's first report, dated February 17, 2004, indicates that he inspected the Echo on May 22 and 23, 2003 at the Hertz maintenance facility. <u>See</u> Document #429-1 at 2. The report concluded that the engine had impacted the master cylinder during the collision, and that the brake fluid reservoir had been knocked from on top of the cylinder and had spilled most of its contents. <u>Id.</u> at 4. He took a sample of the fluid which a chemical analysis showed was normal brake fluid with no contaminants which could have degraded the brake functioning. <u>Id.</u> A brake pedal test indicated that the master cylinder was functioning properly. Mr. Weckerling also indicated that the Echo's maintenance records showed no problems with the brake system, that all the brake pads had sufficient friction material, and that both air bags had deployed. In fact, a review of the Echo's maintenance records established that it had been serviced eight times before the accident, with the average mileage between servicing as just under 2,000 miles. <u>Id.</u> at 3. About a year before the accident, the front brake pads were replaced and the rear brakes were serviced. <u>Id.</u> Mr. Weckerling's report included the following summary:

> This was a one-car accident where the driver failed to negotiate a curve, hit a guardrail on the right and a curb on the left. Passenger Simmons reports he heard "the gas going to the engine" and that the driver failed to respond to his warnings about excessive speed. He wondered if the driver "blacked out" prior to the incident developing. Examination of the driver's medical records may shed light on this possible explanation for the accident. The examination of the brake and steering systems failed to reveal any defects or malfunctions. A pair of skid marks on the gravel shoulder

> proves that both front wheels were braking. Maintenance
> records for the Toyota indicate that there were no problems
> with the brake system and that the vehicle was serviced
> regularly.

Id. at 4-5. Finally, Mr. Weckerling concluded:

> A brake or other mechanical failure did not cause the
> accident. The accident was caused by the failure of the driver
> to maintain control of the car when descending a hill by using
> a lower gear or by applying the brakes in a proper and timely
> fashion.

Mr. Weckerling was later asked to comment on various recently-filed documents

in the case, including Mr. Stapleton's report, other depositions taken, and the plaintiffs'

accusations of evidence tampering. He subsequently issued a second report dated

November 1, 2008. See Document #429-4. In this report, Mr. Weckerling first discussed

Mr. Stapleton's opinions and conclusions:

> Stapleton's conclusions are not supported by his quoting
> unknown "federal standards," by his inaccurate reports on
> vehicle braking, nor by his misinterpretation of the physical
> condition of the brake pads thickness and rotor condition. His
> conclusions are baseless, especially his paragraph #3
> conclusion that this was a "poorly maintained vehicle."

> A deposition taken later established his lack of qualifications
> to be considered an expert on the functioning of brakes, the
> physics of friction and hydraulics, air bags or accident
> reconstruction.

Id. at 2. Finally, Mr. Weckerling concluded:

> No indication of evidence tampering has been revealed, rather
> a misinterpretation of the evidence by Mr. Anders and his
> expert seems to have occurred. The depositions do not reveal

a brake or other mechanical failure. The accident's cause remains the failure of the driver to maintain control of the properly operating Toyota when descending a hill.

Id. at 4-5. These reports of the defendants' expert greatly contrast with the plaintiffs' unsupported and speculative allegations that Puerto Rican Cars breached its alleged duty.

Section 433B(1) of the Restatement (Second) of Torts provides that in negligence cases, "the burden of proof that the tortious conduct of the defendant has caused the harm to the plaintiff is upon the plaintiff." Comment (a) on subsection (1) provides:

> As on other issues in civil cases, the plaintiff is required to produce evidence that the conduct of the defendant has been a substantial factor in bringing about the harm he has suffered, and to sustain his burden of proof by a preponderance of the evidence. This means that he must make it appear that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the harm. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation and conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant.

See also Green v. Morelli Bros., 463 F.2d 725, 729 (3d Cir. 1972).

As a matter of law, then, causation cannot be established by conjecture, speculation, or surmise. The mere possibility that a defendant's negligence may have been the cause of a plaintiff's injury is insufficient to establish a causal link between the two. Causation must be established by a preponderance of the evidence, and the question of whether sufficient evidence has been introduced to sustain a plaintiff's claim of causation is thus a question of law. Id. Here, the plaintiffs have offered nothing but

speculation to establish that Puerto Rican Cars was negligent and that its negligence caused the plaintiffs' injuries. These bald allegations have been offset by the sound conclusions of Mr. Weckerling, the defendants' expert witness.

Generally, in negligence actions where the evidence is in dispute, questions of breach of duty and causation appropriately are resolved by the trier of fact. However, although questions of negligence are usually reserved for the factfinder, summary judgment is proper where the facts are undisputed and only one conclusion may reasonably be drawn from them. Gans, 762 F.2d at 341. In such an instance, determination of negligence becomes a matter of law. Id. Accordingly, there being no evidence to support a breach of duty or causation, summary judgment is proper on behalf of Puerto Rican Cars.

### C. Hertz Corporation

The fourth amended complaint seems to allege liability against the Hertz Corporation because of its relationship with Puerto Rican Cars, allegedly a wholly-owned subsidiary of the Hertz Corporation.[9] The complaint suggests that the Hertz Corporation may be liable for the improper service, maintenance, and inspection of the Toyota Echo. The Hertz Corporation argues that it had no responsibility for the Echo or for any actions taken or not taken by Puerto Rican Cars.

---

[9] According to its responses to interrogatories, Puerto Rican Cars is a wholly-owned subsidiary of Hertz International Limited which in turn is a wholly-owned subsidiary of the Hertz Corporation.

Hertz also argues that in the Virgin Islands there is a presumption of separateness between a parent corporation and its subsidiary, such that the former will not be held liable for the obligations of the latter. <u>See</u> <u>In Re Tutu Wells</u>, 29 V.I. 42, 67 (D. V.I. 1993). Such a discussion is not warranted here, no matter what the corporate structure might be. Because the plaintiffs have failed to established breach of duty, causation, or liability with respect to Puerto Rican Cars, there can likewise be no finding of breach of duty, causation, or liability on the part of the Hertz Corporation. Accordingly, summary judgment is also appropriate on behalf of the Hertz Corporation.

In conclusion, despite the passage of several years, the plaintiffs have been able to prove only that they were involved in an automobile accident while occupying a used 2001 Toyota Echo during a test drive. They have not proven the cause of the wreck, or offered any reliable probative evidence or identified any disputed fact to support their claim that any of the defendants is liable for the plaintiffs' injuries.

An appropriate Order follows.